UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
CARMEN CAMILO,

        Plaintiff,

        -against-

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
--------------------------------x

5/31/13

REPORT & RECOMMENDATION

11 Civ. 1345 (DAB)(MHD)

TO THE HONORABLE DEBORAH A. BATTS,
UNITED STATES DISTRICT JUDGE:


      Plaintiff Carmen Camilo filed this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g), challenging the December 15, 2010 final decision of the Commissioner of the Social Security Administration (SSA) to deny her November 29, 2006 application for disability insurance benefits. Plaintiff and the Commissioner ("defendant") have cross-moved for judgment on the pleadings.


      For the reasons set forth below, we recommend that defendant's motion be denied, that plaintiff's motion be granted in part, and that this case be remanded for further review.

**PROCEDURAL HISTORY**

Plaintiff filed her first application for disability insurance benefits under Title II of the Act on April 18, 2002, alleging disability since December 27, 2001. This application was denied at the ALJ level of review on September 23, 2004. (See Administrative Tr. ("Tr.") at 62-70; Pl.'s Mem. of Law in Supp. of Mot. for J. on the Pleadings (Dkt. No. 19) ("Pl.'s Mem.") at 1 n.3; Def.'s Mem. of Law in Supp. of Mot. for J. on the Pleadings (Dkt. No. 17) ("Def.'s Mem.") at 1 n.1). Plaintiff declined to appeal this decision, making it final and not subject to further review. (See 20 C.F.R. §§ 404.955, 404.987; Pl.'s Mem. 1 n.3; Def.'s Mem. 1 n.1).

On November 29, 2006, plaintiff filed another application for benefits, again alleging disability since December 27, 2001. (Tr. 419-22). The SSA denied her claim upon initial review on March 29, 2007 (id. at 373-80), on the basis that plaintiff's "condition was not disabling on any date through 12/31/06, when [she was] last insured for disability benefits." (Id. at 376).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on May 29, 2007. (Id. at 381-82). The hearing was held before ALJ Marissa Ann Pizzuto on December 16, 2008. (Id.

2

at 46-60). Plaintiff appeared at the hearing with counsel. (Pl.'s Mem. 1). At the hearing, plaintiff amended the onset of her disability to September 24, 2004.[1] (Pl.'s Mem. 1; Tr. 50). In a decision dated June 1, 2009, ALJ Pizzuto found plaintiff not disabled. (Tr. 20-32). Plaintiff requested review of the ALJ's decision by the Appeals Council on June 5, 2009. (Pl.'s Mem. 17). On December 15, 2010, the Appeals Council denied plaintiff's request for review, making the ALJ's decision final. (Tr. 1-7).

## FACTUAL BACKGROUND

### I.   Non-Medical Evidence Before the ALJ

Plaintiff was born in 1967. (Id. at 419). She did not attend school past the third grade and cannot speak or understand English. (Id. at 462, 456).

Ms. Camilo's past relevant work consists of operating a sewing machine at a hat factory from 1993 until 2001.[2] (Id. at 448-49). At that job, she worked eight hours per day, five days

---

[1] See infra, p. 23, n.8.

[2] Plaintiff also reported that she worked as a factory worker between 1986 and 1989. (Id. at 458).

3

per week. (Id. at 449). In her SSA questionnaire, plaintiff reported that this job required her to walk 15 minutes per day, stand one hour per day, sit four hours per day, climb one-half hour per day, crouch one-half hour per day, and handle, grab or grasp big objects for one hour per day.[3] (Id.). The heaviest weight she lifted was 50 pounds, and she frequently lifted 25 pounds. (Id.).

Plaintiff stopped working at the factory in December 2001, after she was involved in a traumatic car accident. (Id. at 53). According to plaintiff, she was walking on the sidewalk when a van jumped the curb and plowed into a group of pedestrians, killing several, and injuring others, including plaintiff, who suffered broken bones and some other, minor injuries. (Id. at 53, 103).

---

[3] However, at another point in the record plaintiff reported that this job required her to stand for eight hours per day. (Id. at 458).

4

II.   **Medical Evidence Before the ALJ**

    A.   **Medical Evidence Prior to the Onset Date of September 24, 2004**

        i.   **Bellevue Hospital**

On December 27, 2001, plaintiff was treated at Bellevue for a broken right thumb and wrist, injuries caused by the accident between the van and pedestrians. (Id. at 103-06, 207, 285-86, 294-96, 354-57, 362, 492-95, 511-12, 518). Plaintiff became agitated in the Bellevue emergency room, then hyperventilated and had to be sedated. (Id. at 105, 203-06). She was seen by a psychiatrist, who noted acute stress, but he could not provide a diagnosis due to the immediacy of events. (Id. at 203). Medical staff at Bellevue gave plaintiff a referral for a psychiatric evaluation to use if she continued to experience psychiatric symptoms. (Id.).

On January 3, 2002, plaintiff underwent surgery at Bellevue to repair her right thumb fracture. (Id. at 116, 212-18, 221-26, 231-32, 237-80, 287-89, 360-61, 363-64, 499-501). On February 20, 2002, doctors removed the pins and wire that had been used to repair the fracture. (Id. at 142-200, 209-10, 290-92, 346-52,

358-59, 365-67, 496-98, 502-04). On March 1, 2002, plaintiff saw Dr. Paul Feldman and complained of back pain, mainly in the thoracic region. (Id. at 305). X-rays were taken, and Dr. Feldman referred plaintiff for physical therapy. (Id. at 306-08). In March and April 2002 plaintiff completed a course of physical therapy for her hand in the Occupational Therapy Department. (Id. at 118-29, 368).

### ii.  Williamsbridge Family Practice

On three occasions between August and October 2002, plaintiff saw Dr. Enrique Pagan at the Williamsbridge Road Family Practice for complaints of back pain, insomnia, nervousness, and anxiety stemming from the 2001 van accident. (Id. at 96-98). Dr. Pagan prescribed Celebrex, Skelatin, and Voltaren for back pain, and Wellbutrin for depression. (Id.). Plaintiff reported to Dr. Pagan in October 2002 that she was going out of the house more frequently, and Dr. Pagan noted that her depression was "doing better" and that she was responding to the medication. (Id. at 98).

On November 2, 2002, Dr. Pagan completed a questionnaire regarding plaintiff's physical limitations. (Id. at 322-26). He noted that plaintiff would be able to lift and/or carry a

maximum of 20 pounds, and that standing, walking, sitting, pushing, or pulling were not affected by her impairment. (Id. at 322). He also stated that plaintiff could occasionally perform a variety of activities, including climbing, kneeling, crouching, and stooping. (Id. at 324). Dr. Pagan concluded that plaintiff had unlimited ability to reach, handle, finger, feel, see, and hear, but noted that her ability to speak was limited. (Id. at 325).

### iii. Social Security Examination

On May 7, 2002, plaintiff was referred by the SSA Office of Disability Determinations to Dr. Peter Graham for examination and evaluation. (Id. at 337-39). In Dr. Graham's report, he wrote that plaintiff had pain on flexion-extension of the spine but had full range of motion and no gross spinal deformity. (Id. at 338). He noted that she had a decreased range of motion in her right wrist, but no swelling, edema, or clubbing. (Id.). Dr. Graham stated that plaintiff's muscle strength and reflexes were adequate and that her hand dexterity was normal. (Id. at 338-39).

**B.** **Medical Evidence During the Relevant Time Period --**
**September 24, 2004 Through December 31, 2006**

**i.  Montefiore Medical Center**

On September 17, 2006, plaintiff was admitted to Montefiore
with complaints of chronic pelvic pain, and was diagnosed with
kidney stones, fibroids, an enlarged uterus, and a uterine cyst.
(Id. at 529-46). She was treated overnight and discharged with a
prescription for Tylenol and told to engage in activity as
tolerated. (Id. at 529).

On November 14, 2006, plaintiff met with Estelle Rosario-
Vargas, a social worker at Montefiore, who provided plaintiff
with a referral for mental health treatment.[4] (Id. at 519-20). In
the referral, Ms. Rosario-Vargas noted that plaintiff had
reported an anxious and depressed mood, sleep disturbance, and
failing-health issues. (Id. at 519). The referral states,
"[Patient] overwhelmed with failing health due [sic] car
accident and job loss." (Id.). Based upon plaintiff's responses
to a questionnaire written in Spanish, Ms. Rosario-Vargas
described plaintiff's condition as "moderately severe
depression". (Id. at 520).

---

[4] Plaintiff's memo incorrectly states that this appointment
occurred on January 14, 2006. (Pl.'s Mem. 2).

C.   Medical Evidence After the Date Last Insured of
     December 31, 2006

     i.   Montefiore Medical Center

Plaintiff was seen at Montefiore on January 25 and January
30, 2007, where it was noted that she had complaints of pelvic
pain. (Id. at 677, 675). Plaintiff was diagnosed with
endometriosis, and it was noted that she had been taking Lupron
for pain since August 2006. (Id. at 675-76). She was scheduled
to undergo surgery (an ovarian cystectomy and myomectomy[5]) on
March 2, 2007. (Id. at 676). On March 13, 2007, plaintiff was
seen for a post-operative follow-up, where she reported that she
was doing well and was taking Tylenol #3 for pain. (Id. at 673-
74). On June 5, 2007, plaintiff was seen for complaints of
abdominal pain. (Id. at 671).

On February 15, 2008 plaintiff complained of depression and
chronic back pain, but denied any suicidal ideation. (Id. at
661). Her treatment plan included prescriptions for the
antidepressants Paxil and Trazadone. (Id.). On March 25, 2008,

---

[5] A cystectomy is defined as a partial or complete removal of the
bladder. See http://www.mayoclinic.org/cystectomy/, last visited
March 27, 2013. Myomectomy is the surgical removal of uterine
fibroids. See
http://www.mayoclinic.com/health/myomectomy/MY00501, last
visited March 27, 2013.

it was noted that plaintiff had a right pelvic mass that was increasing in size. (Id. at 659). An MRI of plaintiff's pelvis dated April 18, 2008 showed an enlarged uterus containing a left fibroid and several smaller masses, a defect within the endometrial cavity that might represent a blood clot/debris, and a right mass containing fluid consistent with endometrioma. (Id. at 664-65).

On April 17, 2008, radiologist Inessa Goldman took an MRI of plaintiff's pelvis, which revealed an enlarged uterus containing a left fibroid and several smaller masses, a possible blood clot, and a right mass with endometrioma. (Id. at 664-65). On June 3, 2008, plaintiff had a mammogram, which revealed scattered fibroglandular densities but no suspicious masses, calcifications or other abnormalities. (Id. at 666).

### ii.   Sound View Mental Health Center

Plaintiff began psychiatric treatment at Sound View on February 6, 2007, where she was seen by Robert Keeler, LMSW. (Id. at 568, 573). In his progress notes, Mr. Keeler noted that plaintiff was accompanied by her sister, and that because of her anxiety plaintiff needed to have someone with her at all times. He also noted that since witnessing an accident on December 27,

10

2001 that killed seven people, plaintiff has suffered symptoms of depression and anxiety. (Id.). Her chief complaints were inability to sleep, decreased appetite, and anxiety. He noted that she had no in-hospital psychiatric treatment history, but had seen a psychiatrist and had taken medicine previously at some point, and was currently not taking any medications. (Id.). He also noted that plaintiff was well-groomed and pleasant but with a guarded, flat affect, depressed mood, and delayed soft speech. (Id.). Plaintiff denied any psychotic symptoms. Mr. Keeler noted that plaintiff's short and long-term memory was impaired, but her judgment, insight, and impulse control were intact. (Id.). On February 9, 2007, plaintiff saw psychiatrist Dr. Ricardo Arango, who noted that plaintiff had a history of anxiety, depression, flashbacks, and insomnia after witnessing an accident in which several people had died. (Id. at 567). Dr. Arango stated in his notes that plaintiff was not functioning at home. (Id.).

On February 20, 2007, Mr. Keeler diagnosed plaintiff with "major depressive disorder, severe, without psychotic features", and post-traumatic stress disorder. (Id. at 569). He noted multiple times that she suffered from "chronic" depression. (Id. at 569, 570).

On March 1, 2007, plaintiff again saw Dr. Arango, who noted that she was still depressed and afraid of going out by herself, but was functioning at home. (Id. at 566). On March 19, 2007, plaintiff was seen by Mr. Keeler, who noted that plaintiff had arrived for the session again accompanied by her sister. (Id. at 622). Plaintiff appeared calm and stable and reported compliance with her medications, but remained socially isolated and found it difficult to go out by herself. (Id.).

On April 23, 2007, Mr. Keeler wrote a letter to the SSA addressing the recent denial of plaintiff's disability-benefits application. (Id. at 599). In the letter, he stated that plaintiff "still suffers from chronic depression, social phobia, and anxiety that limit her functioning in society." (Id.).

Plaintiff was seen again by Mr. Keeler on May 21, 2007, again accompanied by her sister. (Id. at 619). He reported that she remained chronically depressed and socially isolated, and that though she reported no psychotic symptoms, she complained of a lack of desire to pursue things that were previously interesting to her. (Id.). Plaintiff was seen by Dr. Arango on May 24, 2007, who reported that she was still depressed and having sleep difficulties, but was functioning at home. (Id. at 618). On August 6, 2007, Dr. Arango reported that plaintiff was

stable and functioning at home. (Id. at 617).  On August 28, 2007, plaintiff saw Mr. Keeler, again accompanied by her sister. Mr. Keeler reported that plaintiff appeared calm and psychiatrically stable and stated that she was "feeling better," though she remained difficult to engage in verbal therapy because she "doesn't like to talk much." (Id. at 616).

On November 8, 2007, plaintiff saw Dr. Arango, who reported that plaintiff was "still depressed and anxious" and was having sleeping difficulties. (Id. at 615). At that visit, plaintiff requested that Dr. Arango adjust her medication. (Id.).

On December 7, 2007, plaintiff was seen by Anna Morales, LMSW. (Id. at 614). Ms. Morales noted that plaintiff spoke about the December 2001 van accident, and wanted to use the sessions to process feelings of fear and sadness since the accident. (Id.). Plaintiff saw Ms. Morales again on January 8 and February 6, 2008. (Id. at 612-13). On January 8, 2008, Ms. Morales noted that plaintiff reported ongoing depressive symptoms in which she avoided thoughts, feelings, or conversations about the traumatic accident, and wrote that plaintiff's affect was flat and her mood was sad. (Id. at 613). On February 6, 2008, plaintiff reported intense distress when exposed to internal or external cues that symbolized the traumatic event, and also reported

13

irritability, sleep disturbances, lack of concentration, and hypervigilence. (Id. at 612). Ms. Morales again noted a flat affect and sad mood. (Id.).

On February 7, 2008, at the request of the SSA, Dr. Arango prepared a Physician's Report for Claim of Disability Due to Mental Impairment on plaintiff's behalf. (Id. at 681-88). In it, he diagnosed plaintiff with "major depressive disorder severe without psychotic features", with a GAF score of 50.[6] (Id. at 681). He stated that plaintiff self-reported ongoing depression and anxiety, difficulty sleeping and awakening, and ongoing flashbacks. (Id. at 682). He noted that plaintiff was easily distracted, unable to sustain attention/concentration, had "excessive worrying, inadequacy and [was] easily irritated and relate[d] negative events to [her]self." (Id.). Dr. Arango noted that plaintiff had good hygiene and grooming, but her attitude was withdrawn and anxious, and her affect was flat with constricted sensory and intellectual functioning. (Id.). He noted that plaintiff had to lie down during most of the day due

---

[6] A patient's GAF (Global Assessment of Functioning) score quantifies symptoms according to a hypothetical continuum of mental-health illness. A GAF score of 50 corresponds to "Serious Symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)". See https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, last visited April 11, 2013.

14

to feeling lethargic, and that she was taking Prozac, Buspar, and Ambien. (Id. at 683). He also noted that plaintiff would have difficulty traveling alone to work on a daily basis, whether by bus or subway, because she was "easily confused, easily overwhelmed and seeks/requires others to decide." (Id. at 684). When asked about plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Dr. Arango selected "Markedly Limited" for sixteen out of twenty questions, and "Moderately Limited" for the remaining four. (Id. at 685-88).[7] Dr. Arango saw plaintiff the same day, and wrote that she was "stable and functioning at home and school." (Id. at 611).

Plaintiff saw Ms. Morales on March 7, 2008 and again on April 8, 2008. Ms. Morales noted that plaintiff was "able to get in touch with feelings of sadness and fear related to her survivorship of car accident", but had days where she could not get out of bed due to fatigue and lack of motivation. (Id. at

---

[7] Among the categories marked "Markedly Limited" were the ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to maintain attention and concentration for extended periods, the ability to sustain an ordinary routine without special supervision, the ability to make simple work decisions, the ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without unreasonable lengthy rest periods, and the ability to travel in unfamiliar places or use public transportation. (Id.).

609). Ms. Morales noted that plaintiff was not able to tolerate traveling alone to appointments, and had to bring her sister. (Id.). On May 23, 2008, Ms. Morales noted that plaintiff was anxious and sad due to the sudden death of her father, and that plaintiff had requested a psychiatric consult due to worsening depressive symptoms triggered by this loss. (Id. at 606). Plaintiff saw Ms. Morales on July 3, 2008 and August 1, 2008, when they discussed triggers to her depressive symptoms. (Id. at 604-05).

### iii. Social Security Examinations and Reports

#### a. Dr. Herb Meadow

On February 15, 2007, plaintiff was examined by Dr. Herb Meadow, a psychiatric consultant for the SSA, in conjunction with her appeal of denial of benefits. (Id. at 547-50). Under "Current Functioning", Dr. Meadow wrote that plaintiff had trouble falling asleep and a poor appetite, leading her to lose ten pounds in a year. (Id. at 547). She reported being depressed, crying frequently, and having increased irritability, low energy, diminished self esteem, and difficulty concentrating. (Id. at 548). Plaintiff described excessive apprehension, nightmares, and flashbacks to her December 2001

16

accident, as well as panic attacks when she attempted to leave the house on her own. (Id.). Dr. Meadow reported that plaintiff was negative for manic symptoms, thought disorders, and cognitive deficits, and that her mood was depressed and anxious. (Id.). He also stated that her attention, concentration, and memory were all intact, with average cognitive functioning. (Id. at 549).

In conclusion, Dr. Meadow wrote "The claimant would be able to perform all tasks necessary for vocational functioning, with the except [sic] of maintaining a regular schedule, as she has difficulties leaving the house otherwise on her own. The results of this examination appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis providing she does not have to leave the house or if she does leave the house that she is accompanied by someone." (Id. at 549). Dr. Meadow diagnosed plaintiff with panic disorder without agoraphobia, and post-traumatic stress disorder. (Id.).

### b.  Dr. Sharon Revan

At the request of the SSA, Dr. Sharon Revan performed an internal medical examination of plaintiff on February 15, 2007.

(Id. at 551-55). Plaintiff complained of back pain, kidney stones, insomnia, right-hand pain, and depression. (Id. at 551). Plaintiff reported to Dr. Revan that she could take care of her personal needs without assistance, and that she cooked, cleaned, did laundry and shopped with help. (Id. at 552). She reported that she had back pain since the 2001 accident, and that her right-hand pain prevented her from holding anything heavy. (Id. at 551). Dr. Revan noted that plaintiff did not appear to be in acute distress, as her gait was normal, she could walk on her heels and toes without difficulty, and she needed no help getting on and off the examining table and rising from a chair. (Id. at 552). Plaintiff could flex forward 30 degrees in her lumbar spine with low back pain, laterally flex and rotate fully. (Id. at 553). Plaintiff had full ranges of motion of her shoulders, elbows, forearms, wrists, hips knees and ankles. (Id.). Dr. Revan noted no muscle atrophy in any of plaintiff's extremities. (Id.). Plaintiff's hand dexterity was intact, and her grip strength was four out of five on the right hand and five out of five on the left. (Id.). An x-ray taken of her right hand showed mild degenerative joint disease of the first carpo-metacarpal joint. (Id. at 555). Lumbosacral x-rays were negative. (Id.).

18

Dr. Revan diagnosed plaintiff with low back pain, kidney stones, insomnia, right-hand pain, and depression. (Id. at 553). Dr. Revan opined that plaintiff was mildly limited using her right upper extremity for gross motor activity and mildly limited with walking distances, climbing stairs, and prolonged standing and sitting. (Id. at 554).

### c. Dr. R. Gauthier

On February 26, 2007, Dr. Gauthier, a non-examining consultant, reviewed plaintiff's medical records and responded to a request for medical advice. (Id. at 562-63). Dr. Gauthier noted that the record of surgery and post-operative care showed little if any loss of function of plaintiff's thumb as a result of the fracture. (Id. at 562). Further, Dr. Gauthier noted that plaintiff did not have a herniated disc, and the record did not support allegations of severe restrictions due to back pain. (Id).

Dr. Gauthier also completed a physical residual functional capacity assessment of plaintiff, noting that she could occasionally lift and/or carry up to fifty pounds, frequently lift up to twenty-five pounds, and stand and/or walk for a total of about six hours, and that she had unlimited ability to push

19

and/or pull. (Id. at 557). Dr. Gauthier noted that plaintiff had no postural, visual, communicative, or environmental limitations, but was limited in handling (gross manipulation). (Id. at 557-59).

### d. **Dr. P. Kundler**

On March 28, 2007, Dr. Kundler, also a non-examining consultant, reviewed plaintiff's medical file and completed a mental residual functional capacity assessment of plaintiff at the request of the SSA. (Id. at 595-97). Dr. Kundler recited that plaintiff was able to carry out simple and semi-complex instructions, attend and concentrate adequately, interact with mild to moderate difficulty, and adapt to stressors with mild to moderate difficulty. (Id. at 595-96). Dr. Kundler wrote further that plaintiff "is able to bathe, groom, dress (except where allegedly limited by physical impairments), cook some meals, do light housekeeping, [and] manage her own money independently," and that she "claims to require accompaniment to shop or to go outside for more than minimal distances, but this is inconsistent [with] her presentation." (Id. at 597).

20

III.  **Proceedings Before the ALJ**

A.    **Plaintiff's Hearing Testimony**

At the hearing conducted on December 16, 2008, plaintiff testified that she had been treated at Montefiore and Sound View Medical Center, and that she had been diagnosed with major depression. (Id. at 51). She testified that she had been taking medication for depression since 2007, and that her medical treatment had been very consistent since that time. (Id.). She stated that her depression had begun in 2001, after she had witnessed an accident between a van and pedestrians, but that she had had no medical insurance at the time, so she was only able to receive general medical treatment, which did not help her depression. (Id.).

She testified that she was hospitalized in 2006 at Albert Einstein for kidney stones. (Id. at 55). She had been having severe kidney pain for two or three months prior to being hospitalized, but had not seen a doctor due to her lack of insurance. (Id. at 56). She also testified that she had had two surgeries for fibroma, one in 2006 and one in 2007. Her fibroma caused her to bleed constantly for a period of almost a year. (Id. at 56-57). This constant bleeding caused her to become

21

anemic and made her feel weak. (Id. at 57).

Before 2006, she had not been receiving any treatment for her depression, aside from some medication given to her by her general practitioner, which was not helping. (Id. at 52-53). Her primary practitioner had been treating her for back pain resulting from the accident. (Id. at 53). Plaintiff testified that she had not worked at all since the accident. (Id.).

Reporting on her current symptoms, plaintiff testified that she has had some modest improvement, but the same symptoms remain and her condition differs each day. (Id. at 54 ("one day I'm okay and the next day I'm worse.")). Before she was treated for her depression, she would lock herself in her room and would not go outside. She cried frequently, and had trouble concentrating, low appetite, problems sleeping, nightmares, and occasional hallucinations. (Id. at 54-55).

**B.**   **Conclusion of the Hearing**[8]

After taking testimony from plaintiff, ALJ Pizzuto stated
to plaintiff's counsel that she believed that the medical
records from Albert Einstein might prove helpful in making her
determination, because a social worker may have visited
plaintiff while she was being treated for kidney stones. (Id. at
58). The ALJ also stated that she would like to review
"something from her treating doctor now . . . maybe he would be
willing to go back and say it's his opinion that . . . her
condition, at least going back into 2006." (Id.). Plaintiff's
counsel responded that she did not know if she would be able to
procure records from plaintiff's primary-care doctor, who
plaintiff had been seeing intermittently, noting that plaintiff
had had little money to pay him. (Id.). Plaintiff's counsel also
stated that she was not sure whether his office was still in
operation. (Id. at 58-59).

---

[8] It should be noted that at the beginning of the hearing,
ALJ Pizzuto read into the record that plaintiff had previously
filed a claim for benefits, and that ALJ Zamora's September 23,
2004 decision, holding that plaintiff was not disabled, was
final. (Id. at 50). With the consent of plaintiff's counsel, ALJ
Pizzuto amended the onset date of plaintiff's disability to
September 24, 2004. (Id.).

C.    **The ALJ's Decision**

On June 1, 2009, ALJ Pizzuto issued a decision finding that plaintiff was not disabled between the onset date of September 24, 2004 and the date on which she was last insured, December 31, 2006. (Id. at 26-35). In the section labeled "Jurisdiction and Procedural History", the ALJ wrote that plaintiff's attorney, Helen Frieder, Esq., in a note dated January 16, 2009, had requested extra time in order to secure additional medical evidence for plaintiff's case. According to the ALJ, after more than four months, no further evidence was forthcoming. (Id. at 26). The ALJ stated that she had "made significant effort to develop the claimant's medical records," although the administrative transcript does not reflect any effort by the ALJ to seek or subpoena such records, and she stated "that the record [was] complete for adjudication." (Id.).

The ALJ found that plaintiff's last insured date was December 31, 2006, and that she had not engaged in substantial gainful activity after the alleged onset date of September 24, 2004. (Id. at 28). The ALJ found that during that time, plaintiff suffered from fibroids, which the ALJ found to be a severe impairment, that is, causing more than slight limitations in functioning. (Id.).

24

ALJ Pizzuto also found that the accident that plaintiff witnessed on December 27, 2001, had caused a right thumb fracture requiring surgery and mild back pain. According to the ALJ, these problems did not result in more than minimal limitations in plaintiff's functioning. (Id. at 29).

Regarding plaintiff's claims of mental illness, the ALJ stated that the record confirmed that plaintiff was not under any ongoing psychiatric care due to the accident she witnessed until six years after the accident. (Id.). The ALJ found that plaintiff's current treatment records showed that she is depressed and afraid to travel outside her home without someone accompanying her, usually her sister. (Id.). Otherwise, ALJ Pizzuto stated, "she is noted to function normally at home." (Id.). The ALJ found that plaintiff had been prescribed therapy and medications, and is considered to have a "fair prognosis." (Id.).

The ALJ acknowledged that plaintiff's treating psychiatrist had concluded that Ms. Camilo had significant limitations in functioning because of her poor mental health, but the ALJ found that other evidence in the record did not support the psychiatrist's conclusion regarding the severity of plaintiff's condition. (Id.). The ALJ referenced the fact that a psychiatric

25

consultant of the SSA who examined plaintiff, Dr. Meadow, had concluded that her mental health issues were not significant enough to interfere with her daily functioning. (Id.). ALJ Pizzuto also referenced that an SSA psychiatrist who had reviewed plaintiff's record but had not examined plaintiff, Dr. Kundler, had concluded that she had only mild limitations in activities of daily living, social interaction and concentration, persistence or pace. (Id.).

ALJ Pizzuto further stated that even if plaintiff's treating psychiatrist's assessment were accepted, it would not be applicable to the period under consideration, and could not be retroactively applied to that period, which was more than two years before the psychiatrist even met plaintiff. (Id.). The ALJ took notice of the fact that there was very little evidence of any treatment during the relevant period, and opined that the evidence pertinent to the period was sparse and not supportive of a very debilitating condition. (Id. at 31). She also noted that the medical opinions in the record were all rendered after plaintiff's insured status had expired on December 31, 2006, thus making them less than conclusive. (Id.). The ALJ then found that plaintiff's depression had not been "severe" during the relevant time period. (Id. at 29).

26

At step three of the sequential analysis[9], the ALJ found that plaintiff's one severe impairment (fibroids) did not meet or equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.). She also found that during the relevant time period plaintiff had the residual functional capacity to perform the full range of light work, because she could stand and walk for up to six hours in an eight-hour day, sit for at least two hours, and lift/carry up to ten pounds frequently and twenty pounds occasionally. (Id. at 29-30).

At step four, the ALJ found that plaintiff could not perform her past relevant work as a factory worker, as this work required an exertional ability that exceeded her residual functional capacity. (Id. at 31). At step five, the ALJ applied the so-called Grid regulations and found that, based on plaintiff's age (younger), illiteracy, residual functional capacity, and unskilled past relevant work, there were jobs that existed in significant numbers in the national economy that she could have performed. The ALJ therefore found that during the relevant period of September 24, 2004 to December 31, 2006, plaintiff had not been disabled. (Id. at 31-32 (citing Medical-Vocational Rule 202.16)).

---

[9] See infra pp. 35-36.

27

## IV.   The Parties' Cross-Motions for Judgment on the Pleadings

### A.   Defendant's Motion for Judgment on the Pleadings

Following plaintiff's commencement of this action, defendant moved for judgment on the pleadings on October 4, 2011. (See Notice of Motion, dated Oct. 4, 2011 (Dkt. No. 16)). Defendant argues that the commissioner correctly determined that plaintiff was not disabled, and that this decision was supported by substantial evidence in the record. (Def.'s Mem. 15-24).

The Commissioner asserts that although plaintiff originally alleged disability due to back pain, she did not receive any medical attention for back problems during the relevant period. (Id. at 19). He notes that, to the extent that she did have any medical problems during that time, she responded well to treatment at Montefiore and sought no further attention for these conditions until after the relevant period. (Id.). Thus, she had a marked decrease in pain while seen at Montefiore, and she was discharged in stable condition, with only a prescription for Tylenol. (Id. (citing Tr. 529)). Accordingly, defendant argues, the record supports a finding that plaintiff could perform light work during the relevant period. (Id. at 19-20).

28

Defendant further argues that the medical record does not substantiate plaintiff's claim of a disabling mental impairment during the time period in question. (Id. at 20). He asserts that plaintiff did not undergo continuing psychiatric care related to the December 2001 accident until after February 2007, and that there is no record of psychiatric examination or treatment during the relevant period. (Id.). Defendant further contends that the ALJ properly disregarded the opinion of Dr. Arango, as it did not address plaintiff's condition during the period of insurance coverage. (Id.).

## B.    Plaintiff's Motion for Judgment on the Pleadings

Plaintiff cross-moved for judgment on the pleadings on October 25, 2011. She argues, first, that the ALJ erred in finding that she had no severe mental impairment prior to her date last insured. (Pl.'s Mem. 8). Plaintiff contends that the ALJ's characterization of the medical reports in the record was disingenuous and ignored a requirement to further develop the record. (Id. at 9 (citing Tr. 29)). Though the ALJ acknowledged that Dr. Arango had found plaintiff to have severe mental impairments, she concluded that Dr. Arango's opinion was contradicted by the findings of the consultant Dr. Meadow, who had determined that these mental health impairments were not

29

significant enough to interfere with plaintiff's daily functioning. (Id.). Plaintiff argues, however, that Dr. Meadow's conclusion that plaintiff could not maintain a regular work schedule due to her difficulties leaving the house on her own does not contradict the findings of Dr. Arango (id. (citing Tr. 549)), and it does not establish that plaintiff had no severe mental impairments during the relevant period. (Id.).

Plaintiff further argues that the ALJ inappropriately rejected Dr. Arango's medical opinions on the basis that the limitations found by plaintiff's treating psychiatrist did not apply to the relevant period. According to plaintiff, all of the medical records indicate an onset of her psychiatric symptoms beginning when she witnessed the motor vehicle accident in December 2001. (Id. at 11). Plaintiff contends that the ALJ failed to abide by the guiding principles embodied in SSR 83-20, because the ALJ did not consider plaintiff's testimony placing the onset of her symptoms in December 2001, nor the medical evidence and work history that pointed to a December 2001 onset date. (Id.).

Plaintiff also argues that the ALJ had a responsibility to further develop the administrative record by requesting a retrospective opinion from Dr. Arango regarding plaintiff's

onset date. (Id. at 12-13). Plaintiff cites this potential retrospective opinion as critical to making a proper disability determination, and contends that the ALJ should have deferred to plaintiff's treating physician when determining the nature and severity of her impairment. (Id. at 13).

The ALJ's decision was also based upon the findings of a non-examining state agency psychiatrist, Dr. P. Kundler, who found only mild limitations in daily activities and social interactions. (Id. at 9). Plaintiff argues that the opinion of the non-examiner is not substantial evidence, as the non-examining consultant was not provided with any of plaintiff's treatment records, particularly the reports from Dr. Arango, plaintiff's treating psychiatrist. (Id. at 10). Plaintiff also notes that Dr. Kundler is not board-certified as a psychiatrist. (Id. at 10 n.19).

Finally, plaintiff argues that because the ALJ failed to appropriately consider her mental impairments, which are non-exertional in nature, the ALJ erred when she relied on the Medical-Vocational Guidelines ("the Grids"). (Id. at 15). The Grids do not take non-exertional impairments into account, and therefore plaintiff contends that relying on them when making

31

the disability determination was clear error.[10]

## C. **Defendant's Opposition and Reply**

In response to plaintiff's motion -- and in further support of his own motion for judgment on the pleadings -- defendant argues that during the period under review, plaintiff sought little treatment for her alleged disabling condition. He also argues that plaintiff did not seek ongoing medical treatment for depression and anxiety until February 2007, which, defendants point out, occurred after her insured status expired on December 31, 2006. (Id.). The ALJ was not persuaded by Dr. Arango's assessment of significant mental limitations, defendant argues, because it did not apply to the period under consideration. (Id. (citing Tr. 29, 681-89)).

---

[10] Plaintiff also seems to argue that the ALJ erred when she adjusted the onset date of plaintiff's alleged disability from December 27, 2001 to September 26, 2004, because she failed to follow the guiding principles of SSR 83-20. (Pl.'s Mem. 11). However, a decision of a hearing examiner, or of the Appeals Council, is final and has a res judicata effect on a claim for disability insurance benefits if it is not appealed within the prescribed period. See Winter v. Finch, 318 F. Supp. 602, 606 (S.D.N.Y. 1970) (citations omitted); see also Kendrick v. Sullivan, 784 F. Supp. 94, 107 (S.D.N.Y. 1992); 20 C.F.R. § 404.955. The record here shows that the September 23, 2004 denial at the ALJ level of plaintiff's first insurance benefits application was made final when plaintiff did not pursue an appeal. (See Tr. 62-70). As a result, ALJ Pizzuto was required to adjust the onset date to September 24, 2004, and therefore the adjustment was not error.

Defendant also points out that the only evidence from this period concerning treatment for kidney stones and gynecological problems was in September 2006, and the ALJ properly considered this evidence. (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for J. on the Pleadings ("Def.'s Opp'n") at 1).

Defendant further contends that the Second Circuit has rejected the view that an ALJ is obligated to request a retrospective medical opinion, citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996). (Def.'s Opp'n 2). Moreover, he notes, the ALJ held the administrative record open for over four months after the hearing, but plaintiff failed to submit any further information from Dr. Arango regarding her mental health condition. (Id. at 3 (citing Tr. 26, 689)). Because plaintiff had the opportunity to contribute relevant information to the ALJ but chose not to, defendant argues that the ALJ properly decided the case on the available medical evidence. (Id.).

33

## ANALYSIS

### I.   Standard for Benefits Eligibility

In order to qualify for disability insurance benefits, a claimant must "demonstrate that she was disabled as of the date on which she was last insured." Behling v. Comm'r of Soc. Sec., 369 Fed. App'x 292, 294 (2d Cir. 2010) (citing 42 U.S.C. § 423(a)(1)(A)). An applicant is "disabled" within the meaning of the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." Carroll v. Sec. of Health and Human Servs., 705 F.2d 638, 641-42 (2d Cir. 1983) (quoting 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1505, 404.1510; see, e.g., Craven v. Apfel, 58 F. Supp. 2d 172, 183 (S.D.N.Y. 1999); Pickering v. Cater, 951 F. Supp. 418, 424 (S.D.N.Y. 1996).

The Act requires that the impairment be "of such severity that [plaintiff] is not only unable to do [her] previous work

but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (quoting 42 U.S.C. § 423(d)(2)(A)). If the claimant can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that an opening for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A). In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

The SSA regulations set forth a five-step process to evaluate disability claims. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The Second Circuit has described this sequential process as follows:

> *First*, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If

the claimant suffers such an impairment, the *third* inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider [her] disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the *fourth* inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. *Finally*, if the claimant is unable to perform [her] past work, the Secretary then determines whether there is other work which the claimant could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996) (emphasis in original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d Cir. 1983).

Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step, that is, demonstrating the existence of jobs in the economy that plaintiff can perform. See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). In meeting his burden on the fifth step, the Commissioner usually may rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, Tr. 2, commonly referred to as "the Grids."[11]

---

[11] The Grids take into account the claimant's residual functional capacity in conjunction with her age, education, and work experience. Based upon these factors, the SSA uses the Grids to evaluate whether the claimant can engage in any other substantial gainful work that exists in the economy. Zorilla v.

Zorilla, 915 F. Supp. at 667. If, however, plaintiff suffers from non-exertional limitations,[12] exclusive reliance on the Grids is inappropriate. See Butts, 388 F.3d at 383.

## II.   Standard of Review

When a claimant challenges the SSA's denial of disability insurance benefits, the court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)); see also 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported

---

Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). The Grids classify work into different categories based on the exertional requirements of the different jobs. Specifically, the Grids describe work as sedentary, light, medium, heavy, or very heavy, based on the job requirements for primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling. Id. at 667 n.2.

[12] An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect on a claimant's ability to meet the strength demands of jobs. Rosa v. Callahan, 168 F.3d 72, 78, n.2 (2d Cir. 1999) (citing Zorilla, 915 F. Supp. at 667 n.3). "Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demand, that is, other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional." Samuels v. Barnhart, 2003 WL 21108321, at *11 n.14 (S.D.N.Y. May 14, 2003); see also 20 C.F.R. § 404.1569a(c)(1)(i)(vi).

by substantial evidence, shall be conclusive"). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences to be drawn from the facts. See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether the record contains substantial evidence to support a denial of benefits, the reviewing court must consider the whole record, weighing the evidence on both sides of the question. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Williams, 859 F.2d at 258.

It is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witness, including the claimant. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Nonetheless, while the ALJ need not resolve every conflict in the record, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any

determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

In addition to the sufficiency of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Even if the record, as it stands, contains substantial evidence of disability, the SSA decision may not withstand challenge if the ALJ committed legal error. Balsamo, 142 F.3d at 79. Of particular importance, as disability benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to fully develop the administrative record, even when claimant is represented by counsel. Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (citing Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)); see also Butts, 388 F.3d at 386. To this end, the ALJ must make every reasonable effort to help an applicant get medical reports from her medical sources.    20   C.F.R.   §§   404.1512(d),   416.912(d).   More specifically, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." Casino Ortiz v. Astrue, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. §

404.1513(e)(1)-(3)). The ALJ must therefore seek additional evidence or clarification when the "report from claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

The ALJ must also adequately explain her reasoning in making the findings on which her ultimate decision rests, and in doing so must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Pacheco v. Barnhart, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) ("It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [her] reasoning to permit the reviewing court to judge the adequacy of [her] conclusions."). Courts in this Circuit have long held that an ALJ's "failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996).

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings. See 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing."). If there are gaps in the administrative record or the ALJ has applied an improper legal standard, the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83. Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386.

## III.  **Evaluation of ALJ's Decision**

We note first that plaintiff, in arguing that she was disabled during the relevant period, focuses almost exclusively on her psychological symptoms and treatment. While her fibroids and back pain are mentioned, plaintiff seems to be arguing that it was her mental condition that was disabling and caused her inability to function during the time period in question. (See Pl.'s Mem. 8-16). Thus, we focus solely on plaintiff's mental condition in our analysis.

For the reasons enumerated below, we conclude that the ALJ misapplied the treating-physician rule, failed to sufficiently develop the record, failed to properly evaluate plaintiff's credibility and improperly relied on the Grid regulations, all justifying remand.

### A. **The ALJ Failed to Properly Apply the Treating-Physician Rule and to Fully Develop the Record**

#### i. **The ALJ's Findings**

In making the determination that plaintiff's mental condition was not disabling during the relevant time period, ALJ Pizutto made several errors in her analysis, including a misapplication of the treating-physician rule. In her report, the ALJ found that Dr. Arango's medical reports were irrelevant to her analysis, as they pertained to plaintiff's medical condition after her date last insured. (Tr. 29). Despite the fact that Dr. Arango was plaintiff's treating psychiatrist who saw her on a monthly basis, the ALJ made only brief mention of his analysis and diagnosis before dismissing his findings in their entirety. (See id. at 29, 31).

The ALJ further stated that Dr. Arango's opinion was contradicted by other evidence in the record, namely the reports

42

by SSA consultants Dr. Herb Meadow and Dr. P. Kundler. (Id.). The ALJ described Dr. Meadow's analysis as finding that plaintiff's mental health issues were "not significant[] enough to interfere with her daily functioning" and found that this opinion directly contradicted Dr. Arango's diagnosis of mental disability. (Id. at 29). The ALJ also found that Dr. Arango's diagnosis was contradicted by the non-examining SSA consultant Dr. Kundler. The ALJ noted that Dr. Kundler had concluded, after examining plaintiff's records, that plaintiff had "only mild limitations in the areas of activities of daily living, social interaction and concentration, persistence or pace." (Id.). These findings, according to the ALJ, did not support the conclusions of severity that Dr. Arango attributed to plaintiff's mental condition. (Id.).

The ALJ gave no mention of the reports and notes of Robert Keeler, the social worker who saw plaintiff on a monthly basis beginning in March of 2007, despite the fact that his reports referred specifically to plaintiff's longstanding and chronic mental-health issues. (See, e.g., id. at 568-70, 573, 599, 619, 622). The ALJ also cited the fact that there were very few records pertaining to mental-health treatment during the relevant time period as an indicator that plaintiff's mental condition was not severe. (Id. at 29, 31).

43

## ii. **The Treating-Physician Rule**

The SSA regulations specify that "the opinion of a claimant's treating physician as to the nature and severity of the claimant's impairments is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (quoting 20 C.F.R. § 404.1527(d)(2)).

Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, see Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993), the treating physician's findings need not be given controlling weight if they are inconsistent with other substantial evidence in the record, including, when appropriate, the opinions of other medical experts. Burgess, 537 F.3d at 128; 20 C.F.R. § 404.1527(d)(2). Indeed, the opinions of non-examining sources may override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the record. See, e.g., Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995). The findings of such consulting doctors are to be treated as opinion evidence

44

pertinent to the nature and severity of the claimant's medical condition. 20 C.F.R. § 416.927(f)(2)(i).

However, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128. This category includes a consultant's opinion rendered "in terms 'so vague as to make it useless in evaluating' the claimant's [condition]." Id. at 129 (quoting Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)). Similarly, the opinions of consulting physicians, whether examining or non-examining, are entitled to relatively little weight where there is strong evidence of disability in the record, Simmons v. U.S. R.R. Ret. Bd., 982 F.2d 49, 56 (2d Cir. 1992), or in cases in which the consultant did not have a complete record before him. E.g., Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996)(citing cases).

Even if the treating physician's opinion conflicts with other medical evidence that might be considered "substantial," the ALJ must still consider various factors to determine how much weight, if any, to give that doctor's opinion. Among those considerations are: "the [l]ength of the treatment relationship and the frequency of examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . .,

45

particularly medical signs and laboratory findings supporting
the opinion; the consistency of the opinion with the record as a
whole; and whether the physician is a specialist in the area
covering the particular medical issues." Burgess, 537 F.3d at
129 (quoting C.F.R. §§ 404.1527(d)(2)(i)-(ii), (3)-(5)). An ALJ
must not substitute her "own assessment of the relative merits
of the objective evidence and subjective complaints for that of
a treating physician." Garcia v. Barnhart, 2003 WL 68040, at *7
(S.D.N.Y. Jan. 7, 2003).

Even if a current treating physician did not treat the
claimant during the relevant period, his opinion is still
entitled to significant weight. See Dousewicz v. Harris, 646
F.2d 771, 774 (2d Cir. 1981). "[A] diagnosis of a claimant's
condition may properly be made even several years after the
actual onset of the impairment." Id. (citing Stark v.
Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974)). Such a
diagnosis must be evaluated in terms of whether it "is
predicated upon a medically accepted clinical diagnostic
technique" and whether, "considered in light of the entire
record, it establishes the existence of a[n] [] impairment"
prior to the conclusion of the relevant period. Id. (citing
Stark, 497 F.2d at 1097). The fact that a claimant's current
treating physician provided an opinion after the date that the

claimant was last entitled to disability insurance does not render that opinion irrelevant, as the ALJ is to afford the current treating physician's opinion significant weight. Murray v. Astrue, 2008 WL 4580020, at *6 (S.D.N.Y. Oct. 14, 2008) (citing Dousewicz, 646 F.2d at 774).

### iii. Dismissal of Dr. Arango's Opinion as Irrelevant Was Error

The ALJ misapplied the treating-physician rule when she dismissed Dr. Arango's opinion as irrelevant. In rejecting Dr. Arango's opinion, she cited the fact that Dr. Arango made his diagnosis after the relevant time period. (See Tr. 29, 31). This explanation fails as a matter of law.

ALJ Pizzuto erred when she dismissed Dr. Arango's opinion as irrelevant based on the fact that it was made after the relevant disability coverage period. As we have noted, "evidence that a claimant suffered from a disability after the date last insured is relevant to the question whether the claimant was disabled prior to the date last insured." Brown v. Apfel, 1998 WL 767140, at *4 (E.D.N.Y. July 22, 1998) (citing Arnone v. Bowen, 883 F.2d 34, 39 (2d Cir. 1989)).

Dr. Arango's finding here is particularly pertinent. Ms. Camilo began her psychiatric treatment at Sound View Mental Health Center on February 6, 2007, less than six weeks after the expiration of her insured status. (Tr. 568, 573). Moreover, at that time the social worker who she saw, Mr. Keeler, noted her history of depression and anxiety since the 2001 accident. She then saw Dr. Arango only two days later, and he also confirmed her history of anxiety and depression and her inability even to function at home. (Id. at 567). Less than two weeks later, Mr. Keeler noted a diagnosis of "major depression disorder, severe" and post-traumatic stress disorder (id. at 569), and observed that her depression was "chronic." (Id. at 569, 570). Plainly these observations speak directly to plaintiff's mental status as of December 41, 2006 and earlier.

More generally, the Sound View records of Dr. Arango, Robert Keeler, and Anna Morales throughout plaintiff's treatment period are certainly relevant to assessing plaintiff's condition during the relevant time. These reports repeatedly refer to severe and chronic depression, symptoms of crippling anxiety, and a significant inability to function socially, stemming from a traumatic incident that occurred in 2001. (See, e.g., Tr. 566,

48

567, 568-73, 578, 599, 613-15, 619, 622).[13]

### iv. **The ALJ's Reliance on Dr. Meadow and Dr. Gauthier Was Error**

In making her finding that plaintiff was not disabled by her mental condition during the relevant time period, ALJ Pizzuto relied heavily on the one-time evaluation that plaintiff received from Dr. Meadow, the SSA consulting physician. The law is clear, however, that onetime assessments should not be considered "substantial evidence" under the treating-physician rule. Brown v. Comm'r of Soc. Sec., 2011 WL 1004696, at *4 (E.D.N.Y. Mar. 18, 2011) (citing Spielberg v. Barnhart, 367 F. Supp. 2d 276, 283 (E.D.N.Y. 2005)). "In making a substantial evidence evaluation, a consulting physician's opinions or report should be given limited weight", because "they are often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of

---

[13] We also note that it seems contradictory, at the very least, for the ALJ to dismiss Dr. Arango's post-disability period diagnosis as irrelevant because of its timing, yet give controlling weight to the opinions of the two SSA consultants, who made their findings later than Dr. Arango. Though the ALJ noted in her decision that all of the medical opinions pertaining to plaintiff's mental condition were made after plaintiff's insured status had expired, thus making them "less than conclusive" (id. at 31), she still seems to have premised her finding of no disability on the reports of the SSA consultants and the sparse record.

the claimant on a single day." <u>Gonzalez v. Apfel</u>, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000) (citing <u>Crespo v. Apfel</u>, 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999)).

Further, Dr. Meadow's opinion does not, as the ALJ found, contradict Dr. Arango's opinion. Notably, although Dr. Meadow found that plaintiff's mental condition would not interfere with her ability to function on a daily basis, he also concluded that she would be functional only if she "does not have to leave the house, or if she does leave the house that she is accompanied by someone." (Tr. 549). This is certainly consistent with Dr. Arango's findings that plaintiff suffered from debilitating depression and anxiety that would prevent her from working outside the home. In fact, the majority of Dr. Meadow's findings actually supports an inference of disability, such as plaintiff's anxiety, frequent crying, poor appetite, trouble sleeping, trouble concentrating, and panic attacks when attempting to leave the house on her own. (<u>Id.</u> at 547-48).

ALJ Pizzuto also relied on the opinion of the non-examining state agency psychiatrist, Dr. Kundler, in making her determination that plaintiff was not disabled. (<u>See</u> <u>id.</u> at 29). However, the opinions expressed by nonexamining sources, including the opinions of state agency medical consultants and

medical experts, are to be given less weight than an examining source's opinion. See 20 C.F.R. § 416.927(d)(1); see also Gonzalez, 133 F. Supp. 2d at 589. The regulations permit the opinions of non-examining sources to override treating sources' opinions, but only provided they are clearly supported by evidence in the record. See McDonaugh v. Astrue, 672 F. Supp. 2d 542, 567 (S.D.N.Y. 2009) (citing Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993)).

Further, if the ALJ did allow the opinion of a nonexaminer to override that of a treating physician, the ALJ would still be obligated to use the factors enumerated in C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) to explain why the treating physician's opinion did not control and to specify what weight she gave the treating doctor's findings. See Murray, 2008 WL 4580020, at *6. ALJ Pizzuto failed to undertake that analysis and did not provide sufficient reasoning as to why the opinions of a nonexamining source and a one-time examiner should control over the opinion of plaintiff's treating psychiatrist. Moreover, had she gone through such an analysis, she would have had to take into account Dr. Arango's extended and frequent treatment of plaintiff over a fifteen-month period, Dr. Arango's expertise as a psychiatrist and the other evidence in the record corroborating his findings.

**v. The ALJ Failed to Address Evidence in the Record
That Corroborates Dr. Arango's Opinion**

Aside from the fact that Dr. Meadow's report mainly corroborates, rather than contradicts, Dr. Arango's diagnosis, there exists other evidence in the record that supports Dr. Arango's opinion that plaintiff was disabled during the relevant time period. The failure to address this evidence supporting disability was a violation of the ALJ's duty to address all of the evidence in the record.

Dr. Arango's opinion is corroborated by social worker Robert Keeler's February 6, 2007 report, which stated that plaintiff had been "functionally disabled for at least the past 12 months." (Id. at 654). Defendant admits that the ALJ overlooked this report, but argues that this was proper because Mr. Keeler is "not an acceptable medical source", and therefore the ALJ was not bound by the report. (Def.'s Mem. 20-21 n.11). However, the case cited by defendant only stands for the proposition that an ALJ does not have to give the opinion of a non-treating medical provider controlling weight, not that an ALJ is justified in disregarding the opinion in its entirety. See Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995). Though it is true that ALJ Pizzuto was not "bound" by Mr. Keeler's

52

assessment, it included relevant evidence regarding plaintiff's ability to work and whether or not she had severe psychiatric symptoms during the time period in question, all of which would have been helpful in making a disability determination. Indeed, 20 C.F.R. § 404.1513(d), cited by defendant, reads: "In addition to evidence from acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to . . . (3) Public and private social welfare agency personnel". 20 C.F.R. § 404.1513(d). Further, even though Mr. Keeler was not an "acceptable medical source" for purposes of establishing impairment, his opinion should have been considered to show the severity of plaintiff's impairment and how it affected her ability to perform work. See, e.g., Roat v. Barnhart, 717 F. Supp.2d 241, 264 n.8 (N.D.N.Y. 2010); Leisten v. Astrue, 2010 WL 1133246, at *5 n.4 (W.D.N.Y. Mar. 23, 2010). The ALJ's failure to acknowledge this evidence, much less to address it, was error.

Dr. Arango's diagnosis was also corroborated by other evidence from the relevant time period. Notably, this includes plaintiff's November 14, 2006 visit to Montefiore, at which social worker Estelle Vargas noted that plaintiff was in need of

mental health treatment, and referred her to Sound View. (Id. at 519-20).

Further, there is substantial evidence that plaintiff's condition made it difficult, if not impossible, for her to leave her home by herself, and that she was only able to do so when accompanied by her sister. (See, e.g., id. at 548, 566, 568, 609, 622). Though she might have been able to "function normally at home", as the ALJ found, that finding is largely irrelevant to the analysis of whether plaintiff was able to work during the relevant time period. Plaintiff's previous unskilled factory job, combined with her inability to speak English, make it unlikely, to say the least, that a comparable job exists that plaintiff could have performed without leaving her home. Given the substantial amount of evidence that plaintiff lacked the mental capacity to leave her home, and the absence of an express finding by the ALJ that she was mentally fit enough to work away from home, it is questionable whether the ALJ's decision supports the conclusion that plaintiff was able to carry on substantial gainful activity during the relevant time period.

The ALJ also failed to address the considerable evidence suggesting that plaintiff's psychiatric issues were caused by her December 2001 accident, and therefore did not suddenly

54

appear after the relevant time period. While there is no evidence that even suggests that plaintiff's severe psychiatric problems began or were significantly exacerbated post-December 31, 2008, there is substantial evidence in the record that her psychiatric symptoms of severe depression and anxiety were triggered by her traumatic accident. (See id. at 105, 203-06, 96-98, 99, 315-21). Had the ALJ paid proper attention to this evidence, it would have provided corroboration for Dr. Arango's diagnosis of severe depression, and pointed to a finding that plaintiff was severely disabled by her mental condition during the relevant time period. Instead, by ignoring this evidence, the ALJ's findings seem to suggest that plaintiff's severe depressive symptoms were somehow triggered after her disability insurance period ended, though the ALJ points to nothing in the record that can underscore that assumption.

As for the ALJ's observation that plaintiff was not treated for depression until after December 31, 2006, while undoubtedly correct, that fact cannot justify the weight that the ALJ puts on it. In plaintiff's hearing testimony, she acknowledged that she did not receive mental health treatment before 2006 (id. at 52-53), but she also twice explained that her uninsured status kept her from getting needed medical treatment. (Id. at 51,

56).[14] Given the circumstances, the fact that plaintiff did not seek out the mental health treatment for which she received a referral until February of 2007 -- which, it must be noted, is only slightly more than a month after her insured period ended -- does not meaningfully contradict Dr. Arango's findings of severe depression, anxiety, and inability to function outside the home. To the contrary, it seems to suggest that plaintiff had been suffering from these symptoms for at least a portion of the time period at issue. The fact that she was exhibiting severe depressive symptoms just one month following the relevant time period plainly allows the possibility that plaintiff had a disabling condition that would have kept her from being able to work by, or indeed before, December 31, 2006.[15]

In sum, the ALJ failed to address any of this evidence as potentially supportive of disability, and therefore violated her duty to address all of the evidence in the record. See 20 C.F.R.

---

[14] The ALJ did not state that she disbelieved this testimony, and she certainly did not undertake a proper credibility analysis regarding the rest of plaintiff's testimony. See pp. 66-67, infra.

[15] Plaintiff first saw Richard Keeler shortly after her insurance period expired, and continued to receive mental health treatment throughout that year. This treatment might be probative as to whether she was disabled in the immediately preceding period. See, e.g., Pino v. Astrue, 2010 WL 5904110, at *19 n.51 (S.D.N.Y. Feb. 8, 2010), adopted, 2011 WL 814721 (S.D.N.Y. Mar. 8, 2011).

In sum, the ALJ failed to address any of this evidence as potentially supportive of disability, and therefore violated her duty to address all of the evidence in the record. See 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).

### vi. The ALJ's Failure to Request a Retrospective Opinion from the Treating Psychiatrist Was Error

The ALJ also erred in failing to seek out a retrospective opinion from Dr. Arango. SSA regulations state that "[w]hen the evidence from [claimant's] treating physician . . . is inadequate for [the ALJ] to determine whether [claimant] is disabled, . . . [the ALJ] will first recontact [claimant's] treating physician . . . to determine whether the additional information . . . is readily available." 20 C.F.R. § 404.1512(e)(1). Furthermore, where there is ambiguity regarding whether a treating physician's statement bears on the alleged period of disability, the ALJ must seek to resolve this ambiguity through additional medical evidence. Rogers v. Astrue, 2012 WL 4473266, at *9 (S.D.N.Y. Sept. 28, 2012) ("[I]t was legal error for the ALJ to rely on Plaintiff's lack of evidence from the relevant time period to deny benefits without first attempting to adequately develop the record, or to pursue the possibility of retrospective diagnosis.") (citations omitted).

remand. See, e.g., Lacava, 2012 WL 6621731, at *12; Brown v. Apfel, 1998 WL 767140, at *4-5, n.5 (E.D.N.Y. July 22, 1998).

The record in this case is unclear as to whether Dr. Arango's opinions regarding plaintiff's medical condition apply to the period at issue, as Dr. Arango does not specifically address the time period of 2004 through 2006 in his diagnosis. In the face of such ambiguity, the ALJ should have sought clarification from Dr. Arango by requesting a retrospective opinion. See, e.g., Lacava v. Astrue, 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012), adopted, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012); Wiebicke v. Astrue, 2012 WL 2861681, at *17 (S.D.N.Y. July 2, 2012).

Similar to the ALJ's actions justifying remand in Pino v. Astrue, 2010 WL 5904110, at *21, ALJ Pizzuto neither contacted Dr. Arango to obtain his retrospective opinion on plaintiff nor summoned him to the hearing, despite an administrative record insufficient to determine plaintiff's disability during the relevant time period. This too was error.

In defendant's opposition and reply, he notes that plaintiff's counsel did not affirmatively provide access to Dr. Arango or supplement the administrative record in any way,

despite the fact that the ALJ held the record open an additional four months to accommodate any supplemental materials. (Def.'s Opp'n (citing Tr. 26)). However, it is the ALJ's duty to develop the record and resolve any known ambiguities, and that duty is enhanced when the disability in question is a psychiatric impairment. See 20 C.F.R. § 404.1512(e)(1); see also Lamay, 562 F.3d at 508-09; Lacava, 2012 WL 6621731, at *11-12. The fact that ALJ Pizzuto herself recognized the need to supplement the record with additional materials from Dr. Arango -- as evidenced both by her statement at the conclusion of the hearing[16] and the very fact of her allowing more time to submit materials -- clearly shows that this supplemental material was needed in order to make a reliable determination as to disability.

Although retrospective diagnoses do not command the same deference as contemporaneous diagnoses, a treating physician's retrospective opinion is entitled to "significant weight." Dousewicz, 646 F.2d at 774. A retrospective opinion from Dr. Arango regarding plaintiff's mental condition during the relevant period would have shed considerable light on plaintiff's apparently chronic depression, and would have

---

[16] ALJ Pizzuto expressed interest in reviewing supplemental documents from Dr. Arango, and stated on the record that these might be relevant to plaintiff's condition during the time period at issue. (Tr. 58).

allowed the ALJ to make a proper disability determination.

It is also possible that Dr. Arango would have been able to opine as to whether the lack of medical records regarding plaintiff's mental health from the relevant period was attributable to an absence of severe mental disturbance, or was instead likely a result of plaintiff's inability, due to a combination of her disabling condition and lack of resources, to seek out mental-health treatment. See Lacava, 2012 WL 6621731, at *13. Indeed, plaintiff's stated inability to leave her home alone, her language barrier, and her lack of comprehensive health insurance may have all been factors in her failure to seek out such treatment.

Defendant argues in his reply that the Second Circuit has rejected the view that an ALJ has an obligation to request a retrospective medical opinion when making a disability determination. (Def.'s Opp'n 2 (citing Perez, 77 F.3d at 48)). However, in contrast with the record here -- which clearly reflects ambiguities as to whether plaintiff's treating physician's opinion pertains to the time period at issue, and contains quotes from ALJ Pizzuto during the disability hearing stating that a retrospective opinion from Dr. Arango would be helpful -- the Second Circuit in Perez made its determination

60

contains quotes from ALJ Pizzuto during the disability hearing stating that a retrospective opinion from Dr. Arango would be helpful -- the Second Circuit in Perez made its determination based on the fact that "there was nothing presented at the hearing to indicate that retrospective assessments would have revealed any useful information". Perez, 77 F.3d at 48. The Court specifically noted in that case that the ALJ had had a complete medical history for the relevant period, therefore making Perez easily distinguishable on the facts. See id. Moreover, defendant greatly overstates the holding in Perez, as the Court further stated -- in the very same paragraph cited by defendant -- that "[a] treating physician's retrospective medical assessment of a patient may be probative." Id.

A retrospective opinion from Dr. Arango is especially crucial because he began his treatment of plaintiff mere months after the relevant disability period ended. As there is no indication in the record of any events that would have caused psychiatric problems to arise or significantly worsen between December 31, 2006 and when plaintiff was first seen at Sound View on February 6, 2007, it is probable that plaintiff's mental condition and severe depressive symptoms were triggered long prior to that time. Indeed, even if Dr. Arango's opinion is viewed as pertaining only to the period after plaintiff's last

61

insured date, the ALJ should have requested retrospective evidence to fill in these gaps in the evidentiary record. Thus, the ALJ's failure to request a retrospective opinion from plaintiff's treating psychiatrist necessitates remand.

### B.  The ALJ's Failure to Assess Plaintiff's Credibility and Resolve Ambiguities Was Error

#### i.    Credibility Determinations

The ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of her pain and other subjectively perceived conditions and her resulting limitations. See, e.g., Schultz v. Astrue, 2008 WL 728925, at *12 (N.D.N.Y. Mar. 18, 2008) (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999). Where the ALJ's findings are supported by substantial evidence, a reviewing court must uphold the ALJ's decision to discount plaintiff's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

Nonetheless, the ALJ's discretion is not unbounded. The Second Circuit has held that throughout the five-step process "'the subjective element of [plaintiff's symptoms] is an important factor to be considered in determining disability.'"

Perez v. Barnhart, 234 F. Supp.2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984)); see also 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("We will . . . consider descriptions and observations of [a claimant's] limitations from [her] impairment(s), including limitations that result from [her] symptoms, such as pain, provided by [that claimant]"). In assessing a claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp.2d at 340-41. Even if a claimant's account of subjective symptoms is unaccompanied by positive clinical findings or other objective medical evidence,[17] it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123, 128 (2d Cir. 1991) (citing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)).

SSA regulations outline a two-step framework under which an ALJ must evaluate a claimant's subjective description of her

---

[17] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz v. Astrue, 2007 WL 2745704, at *11 (S.D.N.Y. Sept. 21, 2007) (quoting 20 C.F.R. § 404.1529(c)(2)). Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies, [X-rays], and psychological tests." 20 C.F.R. § 404.1528(c).

impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929;
see also SSR 96-7(p). "First, the ALJ must consider whether the
claimant has a medically determinable impairment which could
reasonably be expected to produce the . . . symptoms alleged by
the claimant." Martinez v. Astrue, 2009 WL 2168732, at *16
(S.D.N.Y. July 16, 2009) (alteration in original) (citing
McCarthy v. Astrue, 2007 WL 4444976, at *8 (S.D.N.Y. Dec. 18,
2007)); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).
"Second, the ALJ must 'evaluate the intensity and persistence of
those symptoms considering all of the available evidence.'" Peck
v. Astrue, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010)
(citing C.F.R. § 414.1529(c)(3)(i)-(vii)). "To the extent that
the claimant's 'contentions are not substantiated by the
objective medical evidence,' the ALJ must evaluate the
claimant's credibility." Peck, 2010 WL 3125950, at *4 (citing
C.F.R. § 404.1529(c)); see also Meadors v. Astrue, 370 F. App'x
179, 183-84 (2d Cir. 2010) (citing 20 C.F.R. §
404.1529(c)(3)(i)-(vii)); Taylor, 83 F. App'x at 350-51). It
should be noted that "the second stage of [the] analysis may
itself involve two parts." Sanches v. Astrue, 2010 WL 101501, at
*14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide
whether objective evidence, on its own, substantiates the extent
of the alleged symptoms (as opposed to the question in the first
step of whether objective evidence establishes a condition that

could 'reasonably be expected' to produce such symptoms)." Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Id. (citing Gittens v. Astrue, 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)). If the ALJ does not follow these steps, remand is appropriate. Id. at *15 (citing 20 C.F.R. § 404.1529(c)).

When a claimant reports symptoms more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of a claimant's symptoms and their limiting effects. SSR 96-7(p). These factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20

C.F.R. § 404.1529(c)(3); see also Bush, 94 F.3d at 46 n.4; Wright v. Astrue, 2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008) (citing SSR 96-7(p)).[18]

Finally, "'[o]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis . . . [because requiring] plaintiff to fully substantiate [her] symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose." Martin v. Astrue, 2009 WL 2356118, at *10 (S.D.N.Y. July 30, 2009) (citing Castillo v. Apfel, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

## ii.  The ALJ's Failure to Assess Plaintiff's Credibility

The ALJ's findings note that plaintiff referred during the hearing to her state of depression and symptoms of complete anhedonia, crying spells, decreased concentration, difficulty sleeping, occasional nightmares and hallucinations. (Tr. 30).

---

[18] SSR 96-7(p) states, in pertinent part, "in recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. sections 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements."

symptoms in her findings. Instead, the ALJ repeatedly notes the paucity of evidence of medical treatment during the relevant period, seemingly finding that this lack of evidence directly contradicted plaintiff's self-reported symptoms. (Id. at 30, 31). As noted above, the lack of evidence of mental-health treatment during the time period at issue is not necessarily determinative, especially due to the extensive evidence of mental-health treatment just months after the relevant period ended. Further, the fact that there were sparse medical records from this time period is irrelevant to plaintiff's subjective reporting of her symptoms. If the ALJ found that this lack of evidence contradicted plaintiff's testimony, she should have undertaken the required analysis and made that explicit in her report. Her failure to assess plaintiff's credibility or to engage in any analysis regarding why plaintiff's testimony was not credible necessitates remand.

### iii. The ALJ's Failure to Resolve Ambiguities in the Record Regarding Plaintiff's Self-Reported Symptoms

On November 29, 2006, plaintiff filled out a Personal Health Questionnaire, also referred to as a PHQ-9, which consisted of nine questions, asked in Spanish, covering various

possible symptoms of depression. (Id. at 520).[19] Plaintiff
answered the majority of the questions regarding the frequency
of her depressive symptoms -- such as feelings of hopelessness
and sadness, low energy, and difficulty sleeping -- by the words
"every day." (Id. at 520). She failed to properly fill out two
questions on the form, leaving blank the questions asking how
often she had "lost interest or pleasure in things, and how
often she had low self-esteem or felt that she had failed, or
failed her family." (Id. (translated from Spanish)). It is
unclear whether plaintiff did not fill out these two questions
because she never experienced these symptoms, or for some other
reason.[20] The ALJ did not question plaintiff at the hearing
regarding whether or not she had experienced these symptoms, or
how often she had experienced them, during the time period at
issue.


This constitutes a significant ambiguity in the record,
because if plaintiff had reported that she had been suffering

---

[19] The PHQ-9 is a "self-administered . . . depression module"
which serves as a measure of "depression severity." Kurt Kroenke
et al., The PHQ-9: Validity of a Brief Depression Severity
Measure, 16 J. Gen. Internal Med. 606 (2001); see also Briscoe
v. Astrue, 892 F. Supp.2d 567, 570 n.1 (S.D.N.Y. 2012).

[20] The fact that she marked "0" or "Never" for question 9, yet
left questions 1 and 6 blank, suggests that a missing mark did
not necessarily mean that she had never experienced those
symptoms. (Id.).

from either of these symptoms at a frequency of "often" or "every day", her scaled score, according to the PHQ-9 scoring guide, would have been within, or just barely below, the range evidencing "severe clinical depression." (Id. at 520). The ALJ failed to mention plaintiff's PHQ-9 score in her analysis, thus omitting a key record of plaintiff's self-reported symptoms during the relevant period. It was the duty of the ALJ to resolve this ambiguity by either requesting further records or asking the plaintiff about these symptoms at the hearing and then making appropriate findings.

### C. The ALJ's Reliance on the Grids was Error

Plaintiff further argues that it was error for the ALJ to rely on the Medical Vocational Guidelines, or the "Grids," to determine that plaintiff was not disabled at sequential step five. (Pl.'s Mem. 15-16). Plaintiff cites Butts v. Barnhart for the proposition that exclusive reliance on the Grids was inappropriate here. In Butts, the Second Circuit held that sole reliance on the Grids "may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work the claimant can perform." 388 F.3d at 383. As we have noted, the record appears to reflect that at some point during the

69

insured period -- at least towards its end -- plaintiff suffered from "significant nonexertional impairments". The ALJ found otherwise, but, for reasons stated, that conclusion, in its current form and on the current record, cannot stand. If, upon proper development of the record and based on adequate findings, the ALJ concludes that plaintiff suffered at least from significant mental problems at some point before January 1, 2007, it follows that she cannot use the Grid regulations to dictate an outcome as to disability.

## CONCLUSION

For the foregoing reasons, we recommend that defendant's motion be denied, that plaintiff's motion be granted in part and denied in part, and that the case be remanded for further administrative consideration of plaintiff's disability benefits application.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Deborah A. Batts,

Room 2510, 500 Pearl Street, New York, New York 10007-1312 and

to the chambers of the undersigned, Room 1670, 500 Pearl Street,

New York, New York 10007-1312. Failure to file timely objections

may constitute a waiver of those objections both in the District

Court and on later appeal to the United States Court of Appeals.

See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied, 474

U.S. 1111 (1986); Small v. Sec'y of Health and Human Services,

892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 72, 6(a), 6(e).




Dated: New York, New York
       May 31, 2013


                    SO ORDERED.


                    _____
                    MICHAEL H. DOLINGER
                    UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Order have been sent today to:

Charles E. Binder, Esq.
Binder and Binder P.C.
60 East 42nd Street
Suite 520
New York, NY 10165

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007